This case is under A7-1288, Zenith Electronics Corporation against Pediatrics and Infectious Diseases. Good morning. May I please report? Zenith appeals in this case on a summary judgment granted by the district court finding the two Zenith patents initially here, the 301 and the 513, invalid as well as finding the 301 patent, 1-4 not infringed by reason of an implied license. We asked the court respectfully to reverse that decision on several grounds. First, we believe the district court wrongly construed the claims claim one of each of the two patents. Second, it cited disputed issues of fact and ignored inconsistent and contrary facts. Mr. Brown, let me ask you, if assumed for the moment you realize and you make the argument forcefully and you agree, but assume for the moment that one were to conclude that the district court properly construed what I'll call by way of shorthand and you'll know what I'm talking about, the power source limitation in 301. Assume that construction was correct. Where does that leave you with respect to the anticipation issue based on the prior art television and control? Well, it still leaves that issue lacking, Your Honor, because what happened in addition to the construction is we believe the court improperly shifted the burden of proof to Zina, the non-movement. And secondly, as I said, there were disputed issues of fact here. And one of those, with respect to the invalidity on 301 and also the 513, is a lack of any evidence of public use under 102B. Okay. No, I understand you make that argument and that relates to the prior argument. Your Honor, is there any other claim limitation at issue? There is no other claim. The parties submitted claim terms initially long prior to close of discovery in the court except for in the 513. But I want to talk about in claim one of the 301 patent. Yes. The only limitation at issue is that you're complaining about is supplying operating power to the multifunction encoder. That's correct, Your Honor? Right. That's correct. And what we're saying, obviously, is the district court backed into this construction by looking at the extrinsic evidence of anticipation. But what we're also saying is that if the court construes operating power the way it does, simply meaning power generated by the television receiver to the pillow speaker, it comes out with an anomalous result that all of the prior art that's discussed in the patent, including the prior analog or key closure of pillow speakers, are then subject to invalidating that patent. Okay. But assume that claim construction is correct, is there any dispute that that limitation is met in the prior art? With this particular claim construction, Your Honor. I mean, I think if you accept that claim construction. With that broad claim construction, I don't think that we can say that that's not met either by assuming that the point of view of operating power. I disagree. Assuming it's the prior art. We can't disagree that that's met. But like I said, it's also met by all of the analog pillow speakers because every one of those pillow speakers drew power from the TV. Television was a source of power. And it's not disputed that the other limitations are met in prior art? No, the other limitations we have no particular dispute over. It's just this one operating power, and the reason is because we think the district court obviously should have gone to specification. So if one accepts the district court's claim construction vis-a-vis claim one of the 301 patent, on the validity issue what it really comes down to is was there a public use? Was there public use? Did the court proceed in a proper way? Was there evidence? It really comes down to was there evidence of public use? The only evidence of public use is Mr. Mengel's declaration where he says that they were in public use. PEI never, for instance, took any evidence from the people who would be the direct infringement to the users, such as the hospitals or patients in the hospitals or others. There's no evidence, there's no scintilla of evidence that the steps or the method of that claim one were in public use prior to the critical date. All there is is Mr. Mengel's declaration statement. And as we've pointed out, Mr. Mengel is a somewhat unusual witness in that he is not only a fact witness because he purported to contribute to the circuit of the 205E bill of speakers that Cabell made, but he also became the expert for PEI in this case. And he also was employed by RCA when he seen his largest competitors in this market for over 30 years. He was continuing to consult with them. I gather that you didn't submit or attempt to submit contrary declarations or evidence, but rather relying on where the prudence were placed on the position that there was no prudence to contribute with contrary evidence, unless the case had already been made. Well, we do have contrary evidence here. We have contrary evidence in the form of Mr. Mudra's test report. He was the inventor of the patent suit. Contrary evidence? On the public use issue. Mr. Cook. On the public use issue, we thought it was not our burden to do that. It was not our burden to show that there was a prior public use. Therefore, we didn't submit evidence that there wasn't a public use. And that's what we talk about when we say he shifted the burden of proof here erroneously to Zenith. It depends on how much weight the district court has entitled to place on a controversial statement that there was a public use. And that's why we also made a motion to disqualify Mr. Mangle and her daughter, and we also made a motion to strike his declaration that was filed at the time of filing the summary judgment. Mr. Mangle had two depositions. One is a fact witness. One is an expert. And he submitted two different reports. And in none of these papers does he submit evidence saying, I was there, I saw it. He didn't see it because he had been transferred to the satellite television division of RCA at the time that he purports to have made the statement. There's no support. There's just no evidence or no corroboration for what he said, so we didn't believe it's our burden to go out and find out whether or not this happened. It's their burden to show. It wasn't. We're saying it needed what we did rather than submitting a contrary declaration, which would be to try to prove a negative, would be to say that he had no support for that, judge, so you can't look at that where he doesn't support that. But we did show that he himself was not available at the time that he purported to make the statement. In other words, he wasn't involved with this particular product or process at that time, so he couldn't have known. And we, in fact, there's deposition testimony that's cited from Mr. Mangold where he actually says that he was transferred to this other division and that after he gave the circuit to Kerbel, he really had nothing else to do with it. So what we're concluding there with the court is there's no basis for him to make that statement. So in the other, in terms of the burden of proof in the 513 analysis that was done by the district court, it's probably more clear how he shifted the burden to Zenith on the invalidity question. For example, in his opinion at 814, it says Zenith does not specifically point to any other element of the claimant content that's not anticipated by the J20525. Now this goes back, I think Judge Newman, to kind of your question. What did we do in response to that? Or what did, what did we do on the J2525? Did we submit evidence that each of the elements of the method steps of the 513 was not anticipated? No, we did not because Mr. Mangold's declaration doesn't go through the steps. He doesn't say, I saw this step practice that by these two combinations. He doesn't say that. He talks about distinguishing, but that only goes to one particular step and doesn't even use the exact claim language. So in that case, again, it's not our burden to do that. That's PDI's burden. And, but the district court clearly shifted that burden back to us saying we don't show any evidence that it didn't perform. So I would just say that there is evidence, Cook and Woodruff as to how they believe the combination of the prior work. And for example, with respect to the Covell 205E, it basically was the same thing as a battery powered pillow speaker because the super capacitor that they use, all it could do was absorb a charge. And even the Covell employees say that it would function just like a battery. So again, it just goes back in some ways to claim construction in terms of operating power, which I think we've pretty clearly gone into in our brief, but nevertheless, that evidence is there as to what our expert who is, has a background in remote controls is an electrical engineer. And Mr. Woodruff was a long time electrical engineer who has seen it, how they believe that combination works. And that was in concert distinction to Mr. Mangle's evidence. We also proved that with respect to the 513 and that particular claim term there on program to ignore that Mr. Mangle was inconsistent. And that was again, part of our motion to strike that was ignored by the district court because Mr. Mangle and his deposition said that it was not programmed not to ignore that the prior art did recognize people, but yet he comes back in his declaration. And while he doesn't use the words program to ignore, he says it differentiates. And that's again, where the district court got into trouble because there are two different steps that we're focusing on in the 513 claim. One is decoding data pulses with a microprocessor program to ignore. And the other one is detecting key closures with a timing circuit. Well, the differentiation for key closures voltage signal is the detecting step. And that's the timing circuit. And so what Mr. Mangle does in his declaration, he doesn't use any of the language of the claim. He simply uses the word distinguished and that's picked up by the district court. When the district court says that, well, as long as you can differentiate between the two, you know, that anticipates the claim. Well, that's rewriting the claim language. And that's, that's simply wrong. Um, if I could comment a minute on the, uh, his life license, um, what are the problems in the implied license is that the court here never considered the device that was supposedly subject to the license. That is the pillow speaker. That was a subject to the license agreement. So the court never considered whether there was a 1997 pillow speaker or 2003 pillow speaker, which were completely different animals. So the court never looked at what the quote licensed apparatus was. The patents, the patents were licensed to the manufacturers of the pillow speakers who then sold it. Right. And, but we, again, from the METCO cases, we know from implied license, we have to show that in that case, that there's no non-infringing uses. In other words, the, the mere existence, the license agreement shouldn't carry the name. The patents were licensed. How can the owner of the patent go after,  the user, uh, purchases from, uh, from the licensee? Well, without getting into the exhaustion theory, based basically on the implied license theory, what we need to show is that there are other uses of the license product so that there are non-infringing known. And actually PDI has to prove that there's no non-infringing uses. But the problem here is that, is in fact the same use for which, from everything that we've seen, that the devices were sold. Well, that's where another controversy arises. Because the testimony that we submitted in response to that was from the, the general manager of the two largest pillow, general managers of the two largest pillow speaker makers. And they say, number one, they understood that these pillow speakers were only for Zenith. So there was a restriction. So they were only for Zenith. And the second thing. The restriction wasn't in the license. Well, that is not in the terms of license, but it's expressed in the intent. It says the license agreement specifically say. Looking at the whereas clause. Right. And, and the court simply said, we can't read a whereas as a term. And I would agree with that, but you can read under Illinois law, a whereas to express the intent of the party. The intent may not be entirely clear, but I don't think the whereas clause could undo, if you will, one would read as clearly expressed intent. Otherwise, well, the clearly expressed intent, and this goes back again to some of the other depositions of Mr. Mudra and Mr. Kale was, what was the reason? The reason in 1996 is there were only Zenith in the market because these pillow speakers have Zenith codes. In fact, Zenith. Well, it does talk about available to buyers. It's commercial televisions in the whereas clause. And one says,  buyers. That's a positive statement rather than description. Well, I would say only. And I would, but I would argue from the actual facts as to what was, what the pillow speaker makers thought that they believed in. They only paid royalties on the Zenith, on product views of the Zenith television set. They didn't pay royalties. You're saying the licensee paid no royalties under the patent? The licensee did. On products that were sold for other reasons? They paid royalties to Zenith up until 2003. Up until that point in time, there was no other TV that these pillow speakers were usable with. As a practical matter, they generated Zenith codes. They were only usable with Zenith. There was, they couldn't use it with an RCA or a Philips TV. So as a, as a, as an actual matter, they were restricted by the very construction. In fact, Zenith supplied the encoder chips to the pillow speaker makers to make these. So it was, there was a, a basic understanding that they were only usable with, with this particular product. Good morning, your honors. May it please the court. Let me address first, since we were just talking about the implied license issue. Um, there is exactly zero limitations in the license agreements that Zenith granted. Uh, 301 patents to restrict the valve med tech and, uh, the other pillow speaker manufacturers from selling pillow speakers to hospitals that are going to use them with televisions other than Zenith televisions. There's no evidence in the record, uh, with respect to this last issue of paying up royalties on some TVs and not others. It's just not germane to the issue because the license agreements speak for themselves. And they, they say that the licensed apparatus is any pillow speaker, the use of which is covered by the license patents. And that's exactly what the situation is here. Um, but let, let's just assume that it were feasible, that there was in fact evidence that the parties understood that they should be on televisions with which it's compatible and with which it can be used. And therefore that the, whereas clause states the intention and the background in which the entire agreement is to be construed. Where does that leave us? If you were to make those assumptions that the, that there was evidence to point to the pillow speaker manufacturers having an implicit understanding that the license was limited to use with Zenith televisions, then presumably they would have told the hospitals, we will sell you these pillow speakers. You may only connect them to Zenith TVs. There's absolutely no evidence that that occurred. No, we're all evidence probably not relevant. Right. Exactly. And there is no ambiguity. The, the license languages I just recited, the license grant are quite clear, uh, licensed apparatus, any pillow speaker, the use of which is covered by the license patents. Interestingly enough, it's the use of the license pillow speakers with my clients televisions. That's accused of infringement. I mean, it's that very act. That's the direct infringement. My client is accused of a contributory infringement because it sells the TVs and has a minimal amount of direct infringement alleged against it because it tests it's TVs with pillow speakers on site. What about the issue of non-infringing use? Non-infringing use? Non-infringing. Uh, pillow speakers have control buttons on them, which include the control of televisions and which include sometimes nurse call buttons, white controls, and perhaps radio controls. Uh, so those are uses that this pillow speaker could be equipped to, but they're in addition to the use of the pillow speaker. Pillow speakers are still plugged into the TV, still powered by the TV, and still, at least sometimes, used to control the TV. There's been no evidence that patients are lying in their bed controlling the lights with this pillow speaker and never using it to control the TV. If that's the case, and Zenith wants to, to take that position, that would be fine because then our clients supplying the TVs that aren't in infringement anyway. You can't have it both ways. It's either contributory infringement because of the combined use, or there's no non-infringing use because the combination is used exactly for the purpose that it's sold. It's kind of like saying you have a patented automobile that's got lights and a radio and a navigation system. It's still a patented car just because you turn on the lights or just because you turn on the radio or just because you turn on the nav system. And so I think that argument, uh, really doesn't, doesn't apply in the specific context of these facts. I have, uh, two questions. And, um, um, I can't promise this, but when you answer them, I may not bother you anymore. Um, the first one is this, it relates to the 301. Okay. Uh, Mr, my, my discussion with Mr. Brown, uh, frames this a little bit. Mr. Brown says, okay. He said, assuming one accepts the district court's claim construction, um, the issue on validity anticipation comes down to whether, um, the prior art, the, the RCA television, the other, the other switcher, uh, were in public use. Right. You've heard him say that. Yes. And he said, the problem I have with the district court's conclusion on that is that all PBI has done is come forward with a manual testimony. There's nothing else. He said, there's no corroboration for me. You've heard him say that, right? I sure did. So he's pointing, obviously looking at our Finnegan case, saying that you have to have corroboration. Now, what did the record where in the record is there support for the public use rule of the court that would corroborate, uh, what Mr. Mabel said in his declaration, I guess, is deposition. What did he point to other than that? He just gave me the, the sites.  Um, and I'll, I'll first give you the, the specific section of our brief that has about 10 pages of sites. Okay. But our brief, uh, primary brief at page 17, uh, through, uh, page 28, recites in addition to the Mabel declaration, it says to, uh, well, interestingly enough, it's in its own brief where they argue that the combination of the pillow speaker and the television were unsuccessful 45% of the time. Now I understand that to mean that it was successful 60% of the time, 55% of the time, which seems to me an admission that they would use together. So now we might be in a position of trying to determine. Let's, let's not wait. Yeah. If something fails half the time, it's hard to say what controls. What, what else is there? Okay. Well, so you've got the, the fact that we have, uh, in evidence, a vintage television. So we had the actual TV, uh, which was tested not only by their expert and ours, and apparently Mr. Mooca, the inventor. So we, we have the physical existence of the television. We've got, uh, dated and corroborated, uh, literature, excuse me, I'm, I'm not a historian, but I'm a historian. So, um, a two, a 2130 was the statement of Zenith's brief. Um, the,  declaration of Bengal we've talked about. That's at 1458. Yeah, we're looking for corroboration of that. In addition, we've got, uh, Mr. Mudra's, uh, memorandum at 1545 in the appendix where he specifically mentions that, uh, the RCA and this pillow speaker with the capacitor, uh, were in use, but they had to change to a battery version, and he said that was years. So what you're saying, just to, to, so I, because I don't want to use up all your time, uh, Mr. Aaron says, what you're saying is, if you look, if, if one marches through pages 17 through 28, if you agree, one will find there evidence by way of corroboration for the Bengal statement with respect to prior I believe. Okay. Second question, uh, is this turning to the 513 and, uh, I guess, claim one and again, the validity issue where in the record, uh, in other words, as we know, they haven't anticipated reference. The reference has to, uh, contain all the limitations of the claim, right? Correct. Okay. Where in the record do we have evidence of anticipation with respect to, the last two limitations of claim one of the 513 patent? And specifically, the patent is at, uh, A78 attached to the, to the blue roof. Um, uh, the limitations are detecting said closure with a timing circuit and operating key closure identification circuitry in response to said timing circuit. In other words, I didn't see those two, at least in the record, I didn't see those two limitations discussed and I didn't see evidence, uh, of anticipation in the prior article with respect to those limitations. What do you point to? May I make one comment? Do you understand my question? I exactly understand your question. Let me just make one brief comment, uh, before I answer if I may. And that is that, um, uh, as the district court pointed out, and I understand that this isn't completely controlling, but they pointed out that, that Zenith made no argument that there was any other missing element in the prior, other than the, uh, program to ignore. Well, they did say, I mean, I do think, and maybe I'm being a little bit generous in my reading, but I did take a look going back into the record of the response to the motions and so forth, to your motion. And they did complain about, uh, you know, facts of dispute and so forth. And also, I didn't see, I combine that with the fact that I didn't see really any statement in your presentation of undisputed facts with respect to these two elements. So I, I hear what you're saying, but I kind of think this is a little bit of fair game. Absolutely. And so to specifically answer your question, um, our, our approach on, on those two points, and we, I don't have a site for you, and our argument went like this. The television that was accused of infringing, uh, the, the current day PDI model also doesn't have those features. But yet, it's hard to infringe. So our position was that RTV, which doesn't have those features, infringes with the prior art, which may or may not have those features, but still operates the same way. It differentiates between the data pulses and the key closures. That which infringes it later, anticipates it sooner. That was our theory, and the district court went for that, because the primary issue had to do with the differentiation between the two types of signals, and not so much on the, uh, circuitry of the, uh, of the key closure identification. So I don't have a site for you, and I admit that that's- That's what you basically want. Yeah, that, that's exactly it. I, I will have to take, I don't want to speak for everybody, but it's for my view, I have to take a look at that. It strikes me as maybe a little bit thin. It is. By meeting our, what the law has said we have to meet, vis-a-vis anticipation. And, and I, I will not deny that that's probably our thinnest argument. I'll, I'll let you, I've taken enough of your time, Mr. Ernst, I'll let you get back to other tasks there. Including your crossing field. Yes. We, uh, identified two separate, uh, points in our, uh, cross field. One had to do with the district court's dismissal of our inequitable conduct counterclaim. And the second was a, uh, without explanation, denial of reporting costs to PDI. Um, the, just briefly on the cost issue, PDI clearly was the prevailing party in this matter. And the court just said, no costs, and provided no explanation. And the Seventh Circuit law would require, if nothing else, an explanation. Even if it was going to say that. The cost really has to be a minor issue. It, it is very, that, that's all I'm going to say about it. With respect to the, uh, the matter of the unenforceability, the, the district court treated the, the counterclaim on unenforceability in two ways. In, in one aspect, uh, regarding claims two through eight of the 513 patent, it dismissed the counterclaim with prejudice. It can't be raised again as a defense to those claims. And those claims are, were not found in doubt, and were not found to be non-infringed. So those claims, on remand, in this case, were to be remanded, would be alive and well to be asserted against my client, but we have no defense of inequitable conduct, according to the district court. Now, as this court well knows, inequitable conduct, if found, uh, or unenforceability, it renders all claims of the patent unenforceable. Not just one, or three, or six, or two, but it would render them all unenforceable. So our position was... We have, we have a trial judge who reaches a conclusion whereby your client is not liable under the charges, uh, brought by Zika. And so, we're going to say, nonetheless, that the judge was obliged to go back and review a lot of other issues in case other claims are later asserted. Do you, do you see that as something that the law can get started on, so that they're not going to be lost on claim one? They're going to sue you again on claim two? Well, the, we were sued on claims two through eight of the 513 patent. In another... No, in this lawsuit. In this particular case. That's what I'm trying to understand. You said that they may come back on other claims, and you, uh, My understanding of the dismissal with prejudice of our counterclaim regarding the specific claims two through eight, we would be precluded from raising that again. The judge says the case is open. We have won. Well, the liability issues, it's truly, whatever it was, whatever equities were balanced or so on, the cost, I know you want... Well, you want a review of... Oh, well, two points. One is he dismissed their claim for infringement under two through eight without prejudice. So that can be raised again. They're not foreclosed from asserting those claims against my client. They are not. That's true. But we would be because our counterclaim is dismissed with prejudice. That's the dichotomy is that they have a viable claim that can go forward, and we have a defense that's not going to be. The other thing maybe, Mr. Harris, let's assume for the moment one were to say that there was a problem with the determination and validity of claim one. Okay? That would go back to the district court. Now, there is a footnote in the district. It appears the district court said... So assume for the moment one were to send the validity issue back. Now, claim one is alive and kicking then in terms of validity. So then the question is, has there been a ruling that claim one was not infringed? Okay? I couldn't see a ruling by the district court to that effect. It seemed to me that the district court said claim one is not infringed because he was finding the claim invalid. And because of the implied license. There is no infringement. No, I'm talking about the 5.3 pattern. Oh, I'm sorry. The 5.3 pattern. Right. There is no, there's not two bases for our exculpatory. I'm out of time. See, what I'm saying is, I can see claim one going back saying, you know, it hasn't been established it's invalid, number one. And number two, it hasn't been established that it was not infringed. Right. Hence, in that context, the equitable context would be valid with respect to, I don't know, have merit, but it would be, it's a viable defense. It would be viable with respect to the 5.3. Absolutely. The side claims 2-8. Yes, because it was dismissed without prejudice as to that point. So, thank you very much. Any questions? Any questions? Any questions? Thank you. Thank you, Your Honor. And just my reaction to the last part is that, that was our point, is that the mootness, if it goes back and it's retried again, they do have a chance to bring it in, if Mr. Ahrens is correct, and that they prove an equitable conduct in all claims of that patent. Do you agree, Mr.  that it, assume, assume we send, again, I have to speak hypothetically, obviously, but assume we send claim 1 of the 5.3 back to the district court on the grounds that there wasn't enough to establish the mootness. Okay? Right. Am I correct in thinking that the only reason there's that footnote by the judge or whatever it is saying that claim 1 of the 5.3 was not infringed was because of what he said on the mootness? That's the way we read the case, right? I mean, it seemed that Mr. Ahrens saw it the same way. Right. And the way we read it is that they get to reinstate their equitable conduct. Equitable conduct, if 1 goes back. So that's why we're totally irrespective of the case, we respect whatever the deal is on 2 through 8. Right. Yeah. Judge, are you, are both sides also agreeing that if the district court was correct on the theory of implied license, that the controversy disappears? Well, no, it doesn't disappear with the 5.3. The implied license only goes to the 301 path. So, no, the, it only, it only was a binding or non-infringement on claims 1 to 4 of the 301 path based on the implied license. I just wanted to speak to that briefly, is to, you know, again, reiterate the difference between implied license and exhaustion in that we're not talking about exhaustion here, method claims. We're talking about whether or not a license should be applied under the Beck Coil and other decisions of this court. You have to have PEI coming forward with evidence of no non-infringing uses. And what we're saying is not only did they not do that, in fact, the trial judge admits they did not do that. So, what he does, he steps in and he says, well, here's this license agreement. So, therefore, if this license, you know, therefore, it must be an implied license. But, and we're saying no, the license shouldn't carry that much weight. It shouldn't carry the entire weight. Because, obviously, things like cell phones are subject to numerous licenses. So, can any one licensee claim that just because it's, I've got a license that implies a license all the way down the line? The other factor here is that Zenith put those licenses out there, and the, first of all, they paid 15 cents on a unit that costs 60 to $150, and a television costs several hundred dollars. Zenith would have never entered into that type of agreement, thinking it was totally restricting its ability down the line on a combination, to operate a combination that was worth several hundred dollars. The other point here is that the testimony of the pillow speaker makers is they don't pay license fees to Zenith on the PDI television. So, it really is a non-license problem. That license agreement doesn't operate with respect to anybody else's TV. It's just our own TVs. So, it is a restricted license agreement. This is in the record. And finally, Judge Schultz, I'll go to your conversation as to what else they have with 513, or with the 301. We would submit there's nothing else. Mr. Arons referred to dated literature. Well, the testimony regarding that literature from the people that put it out, which was Crabel, is they're not sure if that literature refers to a battery-operated 205E or the 205E with a supercapacitor. They don't know. So, there's no way that that literature really supports anything. Mr. Woodruff's memorandum was created after the fact, in 1994, based on hearsay. He had heard things about what happened in the field, and he'd heard about the problems that RCA had had. And, in fact, he didn't even want to investigate it because he said it failed. So, that's, we just don't think there's sufficient evidence on 301. Cooperation. Right. Thank you very much. Thank you. Mr. Bradford, Mr. Arons, the case is taken. Thank you. All rise. The Honorable Court is adjourned until tomorrow morning at 10 o'clock a.m.